# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

DO NO HARM,

       *Plaintiff,*

v.

UNIVERSITY OF COLORADO;
TODD SALIMAN, in his official capacity as the President of the University of Colorado;
DONALD M. ELLIMAN, JR., in his official capacity as the Chancellor of the University of Colorado Anschutz Medial Campus;
JOHN SAMPSON, in his official capacity as the Dean of the University of Colorado School of Medicine;
SHANTA M. ZIMMER, in her official capacity as the Senior Associate Dean for Education of the University of Colorado School of Medicine; and
BRIAN KAVANAGH, in his official capacity as the Chair of the Radiation Oncology Department of the University of Colorado School of Medicine,

       *Defendants.*

---

# VERIFIED COMPLAINT

---

    1.    To get hands-on training before they become doctors, medical students typically complete clinical rotations in their fourth year. Those rotations are often available at a school different from their own. These visiting rotations provide fourth-years with an enriching educational experience by exposing them to different areas of

medicine. They also create unique networking opportunities and make these students more marketable when applying for residencies and jobs.

2.     The University of Colorado School of Medicine hosts visiting medical students for an elective rotation in its Radiation Oncology Department. It also gives them a $2,000 scholarship to defray the costs. But this opportunity is not open to everyone. To apply, an applicant must "identif[y]" as belonging to a group recognized as "historically underrepresented in medicine including but not limited to African American/Black, Native American, Hispanic/Latino, Pacific Islander, LGBT+, or those from a disadvantaged socioeconomic background." The medical school doesn't consider whites to be historically underrepresented in medicine. So African Americans, Native Americans, Latinos, and Pacific Islanders can always apply; but many whites and Asian Americans never can.

3.     Defendants' racial classification is unlawful. "Racial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 206 (2023) (cleaned up). Under the Constitution, States have no authority "'to use race as a factor in affording educational opportunities.'" *Id.* at 204. And Title VI of the Civil Rights Act of 1964 further provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

2

4.      Do No Harm has at least one member who is ready and able to apply for the scholarship, but cannot without judicial relief from the medical school's unlawful racial preferences. Do No Harm is entitled to relief.

## PARTIES

5.      Plaintiff, Do No Harm, is a nationwide membership organization consisting of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies.

6.      Do No Harm accomplishes its mission through education and advocacy about the dangerous ideas being embedded in medicine. It has, among other things, sued other private medical organizations for creating racially exclusive fellowships and programs and filed Office of Civil Rights complaints against medical schools that create fellowships and scholarships that exclude students based on race.

7.      Do No Harm has at least one member who is ready and able to apply for the radiation oncology rotation and the Underrepresented Minorities Visiting Elective Scholarship at the University of Colorado School of Medicine, and who will apply for the next open cycle once a court orders Defendants to stop considering race.

8.      The University of Colorado is a state institution of higher education. *See* Colo. Const. art. VIII, §5(1). It operates the University of Colorado School of Medicine at the Anschutz Medical Campus in Aurora. *See id.* art. VIII, §5(1)-(2); Univ. of Colo. Regents Law 1.A.4, perma.cc/FNA5-KTHK. The University—through its

3

medical school—operates the Underrepresented Minorities Visiting Elective Scholarship program, which excludes and disfavors white medical students.

9.    The University receives federal financial assistance. A school "receives federal financial assistance when it enrolls students who receive federal funds earmarked for educational expenses." *NCAA v. Smith*, 525 U.S. 459, 466 (1999) (citing *Grove City Coll. v. Bell*, 465 U.S. 555, 563-70 (1984)). Many students who attend the University use federal student loans to pay for their education. *See* Off. of Fin. Aid, *How Financial Aid Works*, Univ. of Colo. at Boulder, perma.cc/KV4R-JGU9. Many medical students who attend the medical school similarly rely on federal student loans to pay for their medical education. *See* Student Fins., *Student Loans*, Univ. of Colo. Anschutz Med. Campus, bit.ly/3OpXDFm. The University also funds research with federal grants. *See* Rsch. & Innovation Off., *Grants.gov*, Univ. of Colo. at Boulder, perma.cc/P9GH-6T92. And the medical school publicly concedes that it is "subject to the provisions of Title VI." *E.g.*, Univ. of Colo. Anschutz Med. Campus, *Physical Therapy Program Student Clinical Education Handbook* 89 (Aug. 28, 2019), perma.cc/FJ7N-K742.

10.    Todd Saliman is the President of the University of Colorado. Saliman is the principal executive officer of the University and responsible for ensuring that all university matters comply with federal law. Univ. of Colo. Regents Policy 3.A.1(A)-(B), perma.cc/TYA5-W4FT. Saliman is sued in his official capacity.

11.    Donald M. Elliman, Jr. is the Chancellor of the University of Colorado Anschutz Medical Campus, where the medical school is located. Elliman is the chief

executive, academic, and administrative officer for the Anschutz Medical Campus. Univ. of Colo. Regents Policy 3.B.1. Elliman is responsible for the conduct of the affairs of the Anschutz Medical Campus. *Id.* Elliman is sued in his official capacity.

12.    John Sampson is the Dean of the University of Colorado School of Medicine. Sampson is the principal academic and administrative officer of—and is responsible for all matters at—the medical school. Univ. of Colo. Regents Policy 4.A.1, perma.cc/RF6R-TBPL. Sampson is responsible for operating and maintaining the Underrepresented Minority Visiting Elective Scholarship.  Sampson is sued in his official capacity.

13.    Shanta Zimmer is the Senior Associate Dean for Education of the University of Colorado School of Medicine. Zimmer oversees the School of Medicine's academic curriculum and diversity, equity, and inclusion efforts. *See* CU Sch. of Med. Admin., *Organizational Chart* (Nov. 12, 2024), bit.ly/3CH96O6. Zimmer is responsible for operating and maintaining the Underrepresented Minority Visiting Elective Scholarship. Zimmer reports to Sampson. Zimmer is sued in her official capacity.

14.    Brian Kavanagh is the Chair of the Radiation Oncology Department of the University of Colorado School of Medicine. The Radiation Oncology Department operates the radiation oncology rotation for visiting medical students and the Underrepresented Minority Visiting Elective Scholarship. Kavanagh is responsible for operating and maintaining the Underrepresented Minority Visiting Elective Scholarship.

Kavanagh is supervised and overseen by Sampson. Kavanagh is sued in his official capacity.

## JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331.

16.    Venue is proper under 28 U.S.C. §1391 because Defendants reside here and a substantial part of the events and omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

### I.  Defendants' Underrepresented Minority Visiting Elective Scholarship excludes and disfavors students based on race.

17.    Under the traditional four-year, medical-school curriculum, medical students typically complete their clinical rotations in their third and fourth years, during which they gain hands-on experience with patients in various specialties. Ass'n of Am. Med. Colls., *What to Expect in Medical School*, perma.cc/E2F3-GARQ.

18.    In the third year of medical school, students typically complete "core" rotations in specialties such as internal medicine, surgery, obstetrics and gynecology, pediatrics, family medicine, psychiatry, neurology, and radiology. *See* Brendan Murphy, *Future physicians: When's the right time to choose a specialty?*, Am. Med. Ass'n (Apr. 24, 2023), perma.cc/85K2-PALV.

19.    In their fourth year, medical students get to do "elective" clinical rotations. *See* Med. Sch. Insiders, *What Are Clinical Rotations? Medical School Clerkships Explained* (Jan. 4, 2023), perma.cc/3E6N-EFZV. These elective rotations usually last four to eight

weeks. *Id.* In addition to many elective rotations offered at their own schools, medical students have the "opportunity to take electives … at different institutions according to [their] interests." Ass'n of Am. Med. Colls., *What to Expect in Medical School*, *supra*.

20.     Many medical schools in the United States participate in the Visiting Student Learning Opportunities program, which allows fourth-years to pursue short-term, elective learning opportunities in locations away from their own schools. *See* Ass'n of Am. Med. Colls., *Visiting Student Learning Opportunities (VSLO)*, perma.cc/8RVZ-UPGP. Medical schools accredited by the Liaison Committee on Medical Education (*i.e.*, M.D. programs) that participate in the VSLO program allow medical students from other LCME-accredited medical schools to do an elective rotation without charging the students an additional tuition on top of what they already pay at their own medical schools. *See, e.g.*, Univ. of Colo. Sch. of Med., *Visiting Students*, bit.ly/3CN0XrG.

21.     Medical students often take advantage of the VSLO program to pursue an elective clinical rotation at a different school to receive unique training, broaden their understanding of medicine, and make themselves more marketable. It's not uncommon for fourth-year medical students to complete as many as four "away" elective rotations at different schools. *See* Puja Singh, *Making a Fourth Year Schedule*, Inside the Match, perma.cc/BB5H-YAZA.

22.     The University of Colorado School of Medicine hosts visiting medical students in their fourth year from other medical schools to take elective rotations at the

medical school through the VSLO program. *See* Univ. of Colo. Sch. of Med., *Visiting Students*, *supra*.

23.     One of those elective rotations is operated by the medical school's Radiation Oncology Department. *See* Univ. of Colo. Sch. of Med., *Radiation Oncology Elective*, perma.cc/VT6F-KJTG (Ex. A). This visiting elective rotation is open to medical students regardless whether they intend to pursue a career in radiation oncology or another specialty. *Id.* The Radiation Oncology Department "see[s] value in learning about the role of radiation therapy in the management of patients with cancer and benign conditions" even for medical students who do not ultimately become radiation oncologists. *Id.* And it hopes to use the elective rotation to "convince [the medical students] to join [the] field." *Id.*

24.     The Radiation Oncology Department offers opportunities to learn how to "perform focused oncologic histories and exams"; to practice organizing and delivering patient presentations "with an introduction to oncology workups and treatment plans"; to become familiarized "with the workflow of a patient going through radiation treatments including initial consultation, treatment planning, treatment delivery, side effects management, and follow-up care"; and to attend "multidisciplinary conferences and clinics, daily morning chart rounds to review patient care" and "resident didactic sessions." *Id.*

25.     To participate in this visiting elective rotation away from their home schools, medical students must incur additional costs for travel and lodging.

26.     To defray these costs and to make its radiation oncology more attractive to visiting medical students, the Radiation Oncology Department offers the "Underrepresented Minorities Visiting Elective Scholarship"—a "scholarship" up to "$2,000 reimbursement" for "the cost of lodging, travel, and related expenses for [the] four-week elective." Univ. of Colo. Sch. of Med., *Radiation Oncology Elective*, *supra*.

27.     To apply for the scholarship, the visiting medical student must (1) be a fourth-year medical student at an LCME-accredited medical school, (2) be in good standing, (3) apply for the radiation oncology rotation through VSLO's centralized application website, and (4) "send a brief statement of interest (no more than one page), curriculum vitae, and a recent unofficial medical school transcript" to the Radiation Department. Univ. of Colo. Sch. of Med., *Underrepresented Minorities Visiting Elective Scholarship*, perma.cc/8SEF-NRDZ (Ex. B).

28.     Scholarship is prioritized based on the applicant's interest in pursuing a career with underserved populations, service, leadership, and academic achievement. *Id.* And the applications are reviewed on a rolling basis through the end of the calendar year. *Id.*

29.     But the scholarship is not open to everyone. The medical school limits eligibility to those "who identif[y] with groups who are recognized as historically underrepresented in medicine including but not limited to African American/Black, Native American, Hispanic/Latino, Pacific Islander, LGBTQ+, or those from a disadvantaged socioeconomic background." *Id.*

30.    Whites are not historically underrepresented in medicine. The NIH doesn't consider them to be so. *See* NIH, *Underrepresented Racial and Ethnic Groups*, perma.cc/3CYR-GRW5. Neither does the Association of American Medical Colleges. *See* Ass'n of Am. Med. Colls., *Underrepresented in Medicine Definition*, bit.ly/3AM8iHq. Neither does any reasonable speaker of English or observer of reality.

31.    Indeed, the University of Colorado School of Medicine doesn't consider whites to be historically underrepresented in medicine. In its Diversity Plan, the medical school defines "under-represented" medical students as "Black/African Americans," "Hispanics/Latinos," "American Indians/Alaskan Native," "Hawaiian/Pacific Islander," "Vietnamese," and "individuals raised in rural areas." Univ. of Colo. Sch. of Med., *Diversity Plan* 5 (Dec. 22, 2015), perma.cc/RB4F-GBT3. It excludes non-rural whites from that list.

32.    Eligibility for the scholarship thus depends on race. A minority medical student can apply for the scholarship without additionally identifying as LGBTQ+ or socioeconomically disadvantaged. A white medical student, however, is ineligible to apply for the scholarship unless he additionally identifies as LGBTQ+ or socioeconomically disadvantaged. White medical students are thus "force[d] … to overcome additional hurdles" to become eligible for the Scholarship because of their race. *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 473 (N.D. Tex. 2024); *cf. AAER v. Founders First Cmty. Dev. Corp.*, 2024 WL 3625684, at *4 (N.D. Tex. July 31, 2024) (a contracting program discriminates based on race when it requires applicants to "be

Latinx, Black, [or] Asian, or otherwise meet one of the specified demographic categories" such as LGBTQ, military veterans, or women).

33.    On June 4, 2024, Do No Harm filed an administrative complaint against the University of Colorado with the U.S. Department of Education's Office of Civil Rights, alleging that the Underrepresented Visiting Elective Scholarship violates Title VI. That administrative complaint wasn't resolved until November 26, 2024. OCR dismissed the complaint because it thought that the scholarship, despite its express racial requirements, somehow doesn't discriminate based on race because some white students (like those from socioeconomically disadvantaged backgrounds) are eligible. OCR did not cite or explain how that analysis can be squared with basic principles of antidiscrimination law. *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.").

## II.   The Underrepresented Minority Visiting Elective Scholarship discriminates against Do No Harm's white members.

34.    Defendants' Underrepresented Minorities Visiting Elective Scholarship. Do No Harm (through its leaders) knows Member A, has spoken to him about his intentions, and has personal knowledge of the relevant facts.

35.    Member A is a member of Do No Harm.

36.     Member A meets all nonracial eligibility requirements for the Underrepresented Minorities Visiting Elective Scholarship set by the medical school's Radiation Oncology Department.

37.     Member A is currently a third-year medical student at an LCME-accredited medical school and will be a fourth-year medical student starting in mid 2025 and through the 2025-2026 academic year.

38.     Member A is in good academic standing.

39.     Member A is a strong candidate for both the radiation oncology rotation and the scholarship.

40.     Once Member A becomes a doctor, he wants to move to and practice medicine in rural communities, which are generally considered underserved. Though Member A grew up in a suburban area near a city, Member A's father is a doctor who has practiced medicine in both rural and urban areas. Through his father's experience, Member A learned how rural communities need more doctors. Member A hopes to practice medicine in rural communities to meet their needs.

41.     Member A has demonstrated strong academic achievements. Member A has consistently been in the top quartile of his medical school class, and he received an academic award given to only a handful of top medical students in the class.

42.     Member A also has demonstrated strong leadership potential. Member A started and served as the president of a student group and served as the vice president of a different student group at his medical school.

43.     Once Member A becomes a fourth-year medical student, he plans to apply to various elective rotations, including through the VSLO program that would place him at rotations at different medical schools. Member A can access VSLO starting in January 2025 and will begin applying as soon as third-year medical students are permitted to do so.

44.     Member A is interested in applying to the University of Colorado School of Medicine's radiation oncology visiting elective rotation. He wants to get exposure to this area of medicine. And he would use the $2,000 scholarship to defray the cost of lodging, travel, and other expenses incurred during the four-week visiting elective rotation.

45.     Although Member A meets all the nonracial eligibility requirements and would be a strong candidate for the scholarship, Member A is not eligible to apply because he is a white, straight male and does not identify as any other ethnicity. Member A also does not identify as LGBTQ+ or as having grown up in a socioeconomically disadvantaged background or a rural area. Member A finds it hurtful and unfair that his skin color and other demographics, which he cannot control, would be considered by Defendants in any way.

46.     If a court orders Defendants to stop discriminating against white applicants like him, Member A is ready and able to apply to Defendants' radiation oncology rotation and the scholarship in the next available rotation cycle. He has already prepared

the statement of interest that he would submit in support of his application. And he is prepared to submit his curriculum vitae and a recent official medical school transcript.

47.    In the 2024-2025 academic year, the medical school made the VSLO catalog and the rotation dates available in March and began making rolling offers to visiting students for the rotations in April. The four-week rotations started in June, July, August, September, October, and November, January, and February. Though the medical school has not yet said what schedule it will follow for the 2025-2026 academic year, Member A is able and ready to concurrently apply for the first available rotation and the scholarship during the 2025-2026 academic year if a court orders Defendants to stop discriminating against white applicants. If Member A cannot apply or does not get chosen the first time, he is able and ready to apply to each subsequent cycle during the 2025-2026 academic year, should a court order that relief.

48.    Member A is pseudonymous because he is a medical student, and if his participation in this litigation becomes public, he fears reprisal from other students on campus, his professors, school administrators, future employers, and the public. Member A also does not want the medical school to hold his involvement in this lawsuit against him when selecting the scholarship recipients and visiting students.

# CLAIMS FOR RELIEF

## COUNT I
## Violation of the Equal Protection Clause of
## the Fourteenth Amendment to the U.S. Constitution
## (Against Defendants Saliman, Elliman, Sampson,
## Zimmer, and Kavanagh)
## (U.S. Const. art. XIV, §1; 42 U.S.C. §1983)

49.    Do No Harm repeats and realleges the preceding allegations.

50.    Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983.

51.    Defendants Saliman, Elliman, Sampson, Zimmer, Pino-Jones, and Kavanagh are "person[s]" acting under the color of state law. *Id.*

52.    The Fourteenth Amendment provides, among other things, that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV, §1.

53.    The "central mandate" of equal protection is "racial neutrality" by the government. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). And the "'core purpose' of the Equal Protection Clause" is to "'d[o] away with *all* governmentally imposed discrimination based on race.'" *Harvard*, 600 U.S. at 206 (emphasis added). "[W]henever the government treats any person unequally because of his or her race, that person has

15

suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000); *see also Muldrow v. St. Louis*, 601 U.S. 346, (2024) (Kavanaugh, J., concurring in the judgment) (explaining that unlawful discrimination is itself a harm).

54.    Defendants maintain the Underrepresented Minorities Visiting Elective Scholarship program that excludes—and at least disfavors—white medical students.

55.    When the government "distributes … benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

56.    "[A]ll racial classifications … must be analyzed by a reviewing court un-der strict scrutiny." *Adarand*, 515 U.S. at 227. The Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications." *Johnson v. California*, 543 U.S. 499, 505 (2005). "'Absent searching judicial inquiry into the jus-tification for such race-based measures, there is simply no way of determining … what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Id.* (cleaned up).

57.    Strict scrutiny is a "searching examination, and it is the government that bears the burden to prove 'that the reasons for any racial classification are clearly iden-tified and unquestionably legitimate.'" *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (cleaned up). The racial classification "must survive a daunting two-step examination." *Harvard*, 600 U.S. at 206. It must "'further compelling governmental interests.'" *Id.* at

207. And it must be "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.*

58.    Defendants cannot satisfy strict scrutiny.

59.    Defendants cannot show a compelling governmental interest for excluding and disfavoring white medical students. The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *Id.* There is no evidence that Defendants created the Underrepresented Minorities Visiting Elective Scholarship to remedy some past discrimination that they took part in. Instead, Defendants want to give non-white medical students an additional financial resource simply because they belong to certain groups. Such an outright race-based distribution of governmental benefits and resources—especially in the educational context—is patently illegitimate and illegal. *See Brown*, 347 U.S. at 493-94; *Harvard*, 600 U.S. at 216-18.

60.    The scholarship is also not narrowly tailored.

61.    Defendants cannot show that excluding or disfavoring white medical students is necessary to achieve any of the scholarship's interests.

62.    Defendants use race as a "negative" by disadvantaging white students in the application process because of their race.

63.    Defendants use race as a stereotype.

64.    Defendants' use of race has no end date.

65.    Defendants failed to seriously study and adopt workable race-neutral alternatives.

## COUNT II
### Violation of Title VI of the Civil Rights Act of 1964
### (Against Defendant University of Colorado)
### (42 U.S.C. §2000d et seq.)

66.    Do No Harm repeats and realleges the preceding allegations.

67.    Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

68.    The Underrepresented Minorities Visiting Elective Scholarship is a "program or activity" under Title VI because it is an "operatio[n]" of the University of Colorado School of Medicine. Title VI defines "program or activity" to mean "all of the operations of" a "university" "any part of which is extended Federal financial assistance." 42 U.S.C. §2000d-4a(2)(A). The University of Colorado is a public university that receives federal financial assistance.

69.    Private individuals can sue to enforce Title VI and obtain both injunctive relief and damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

70.    Under 42 U.S.C. §2000d-7(a)(1), a state is "not … immune … from suit in Federal court for a violation of … title VI."

71.    The University of Colorado has caused and will continue to cause white students to be "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" the Underrepresented Minorities Visiting Elective Scholarship program "on the ground of race, color, or national origin." 42 U.S.C. §2000d.

72.    At a minimum, because the scholarship violates the Equal Protection Clause of the Fourteenth Amendment, it also violates Title VI. *See SFFA v. Harvard*, 980 F.3d 157, 185 (1st Cir. 2020) ("Title VI's protections are coextensive with the Equal Protection Clause."), *rev'd on other ground* 600 U.S. 181; *cf. Harvard*, 600 U.S. at 308-09 (Gorsuch, J., concurring) (observing that Title VI has "'independent force'" and makes it "*always* unlawful to discriminate among persons even in part because of race" without subjecting racial classifications to strict scrutiny).

## PRAYER FOR RELIEF

Do No Harm asks this Court to enter judgment in its favor and against Defendants and to provide the following relief:

A.    A declaratory judgment that the Underrepresented Minorities Visiting Elective Scholarship violates the Equal Protection Clause and Title VI.

B.    A permanent injunction barring Defendants from seeing or considering applicants' race when selecting the recipients for the Underrepresented Minorities Visiting Elective Scholarship.

C.    Absent reasonably expedited proceedings, a preliminary injunction barring Defendants from opening or closing the application process, or otherwise selecting winners, for the next cycle of the Underrepresented Minorities Visiting Elective Scholarship.

D.      Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

E.      All other relief that Do No Harm is entitled to.

Dated: December 12, 2024                    Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy
Cameron T. Norris
   *Lead Counsel*
Frank H. Chang
Zachary Grouev
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com
zach@consovoymccarthy.com

*Attorneys for Do No Harm*

# VERIFICATION

I, Kristina Rasmussen, declare as follows:

1.      I am over the age of 18, of sound mind, and otherwise competent to sign this verification.

2.      I am the Executive Director of Do No Harm.

3.      I have reviewed this verified complaint.

4.      For the allegations within my personal knowledge, I believe them all to be true.

5.      For the allegations not within my personal knowledge, I believe them to be all true based on my review of the cited materials and Do No Harm's communications, including with Members A.

6.      Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 12, 2024

Kristina Rasmussen
Executive Director of Do No Harm